CLAY, J., delivered the opinion of the court in which SUTTON, J., and RICE, D.J., joined. SUTTON, J. (pp. 810-15), delivered a separate concurring opinion. RICE, D.J. (pp. 815-16), also filed a separate concurring opinion.
OPINION
CLAY, Circuit Judge.
Plaintiff, the American Beverage Association (“Association”), appeals the district court’s order granting summary judgment to Defendants, Governor Rick Snyder, Attorney General Bill Schuette, and Michigan Treasurer Andrew Dillon in their official capacities (collectively Defendants), and the Michigan Beer & Wine Wholesalers Association (“MBWWA”), which intervened in support of Defendants. Plaintiff argues that Mich. Comp. Laws § 445.572a(10), which requires certain returnable bottles and cans to possess a unique-to-Michigan mark designation, violates the dormant Commerce Clause, regulates extraterritorially, and discriminates against interstate commerce. For the reasons set forth below, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.
BACKGROUND
A. Michigan’s Beverage Container Deposit Law
Michigan is one of ten states that requires consumers to pay a can, plastic bottle, or glass bottle deposit when purchasing specified beverage containers. Mich. Comp. Laws § 445.571 et seq.[1] In 1976, Michigan enacted the Michigan Container Act, commonly referred to as the “Bottle Bill.” The purpose of the Bottle Bill was to promote and encourage the recycling of beverage containers by offering a cash refund of a ten-cent deposit to consumers and distributors in an effort to reduce the amount of bottle and can litter. See Mich. Comp. Laws § 445.571 et seq.; see also Michigan Bottle Bill, A Final Report to: Michigan Great Lakes Protection Fund, http://www.michigan.gov/documents/ deq/deq-ogl-mglpf-stutz_249882_7.pdf, at 2 (last visited August 20, 2012). The Bottle Bill requires any beverage — defined as “a soft drink, soda water, carbonated natural or mineral water, or other nonalcoholic carbonated drink; beer, ale, or other malt drink of whatever alcoholic content; or a mixed wine drink or a mixed spirit drink” — to be sold to consumers in “returnable” containers. See id. §§ 445.571(a), 445.571(d). A “returnable” container is a container “upon which a deposit of at least 10 cents has been paid, or is required to be paid upon the removal of the container from the sale or consumption area, and for which a refund of at least 10 cents in cash is payable by every dealer or distributor....” See id. § 445.571(d). All businesses that sell beverages to consumers are required to accept for rebate an empty container “of any kind, size, and brand” of beverage that the retailer (dealer) sells. See id. § 445.572(2). In exchange, the business or a reverse vending machine[2] provides the consumer a ten-cent deposit *801 refund paid on that container. The retailers then return the empty containers to beverage distributors or manufactures and collect the ten-cent refund. See id. § 445.572(6). The Bottle Bill requires beverage containers sold within the State to clearly indicate the state’s name and the containers’ refund value. See id. § 445.571(d). That information appears as “MI 10$” on each individual beverage container.
B. The Redemption Problem
Although the Bottle Bill has been successful in improving the environment by promoting the recycling of beverage containers, the bill also created two unanticipated problems: (1) consumers deposited more money on nonalcoholic beverage containers than distributors or manufacturers paid out in refunds (underredemption); and (2) the value of the deposits collected by the distributor or manufacturer was less than the total value of refunds paid (overredeemption). To address the problem of underredemption, the Michigan Legislature amended the Bottle Bill in 1989, and mandated that the value of unclaimed deposits escheat to the State Treasury. Under the amendment, the State Treasury gave 25 percent of the unclaimed revenue to in-state beverage retailers and the remaining 75 percent financed a Michigan cleanup and redevelopment trust fund. See id. § 445.573(c).
Despite the 1989 Bottle Bill Amendment, the redemption problem continued. Specifically, the State recognized that individuals would purchase beverage containers outside of Michigan and then attempt to return the beverage containers in Michigan to redeem the ten-cent deposit. As a result, the unauthorized returns and redemptions reduced the revenue stream to the State because no deposit was paid to the State of Michigan. A 1998 study estimated that fraudulent redemption in Michigan of beverage containers originating from outside of Michigan resulted in a loss of $15.6 to $30 million every year in Michigan deposits. In an effort to reduce these fraudulent redemptions, the Michigan Legislature enacted a statute criminalizing the redemption of containers by any individual who knows or should have known that no deposit was paid on the container. See id. §§ 445.574a and b.
C. Michigan’s Unique-Mark Amendment to the Bottle Bill
In December 2008, the Michigan Legislature amended the State’s Bottle Bill in order to increase revenue to the State. The Amendment required that, in addition to the MI 10$ designation, containers for certain brands of beverages bear a “symbol, mark, or other distinguishing characteristic that is placed on a designated metal container, designated glass container, or designated plastic container by a manufacturer to allow a reverse vending machine to determine if that container is a returnable container....” See id. § 445.572a(10). The mark “must be unique to the state,” and can be “used only in this state and 1 or more other states that have laws substantially similar to this act.” Id. The provision does not define “substantially similar,” but the State interprets the phrase to include all states with Bottle Bill deposit schemes, including those where the deposit is less than Michigan’s. Failure to comply with the new provision could result in a penalty of up to six months’ imprisonment and/or a $2,000 fine. See id. § 445.572a(ll). The provision applies only to companies that meet the State’s specified threshold sales requirements.
On March 1, 2010, the Bottle Bill provision went into effect for nonalcoholic beverages in 12-ounce metal containers.[3] See *802 id. § 445.752a(2). On February 24, 2011, the provision went into effect for nonalcoholic beverages in 12-ounce glass or plastic containers.[4] See id. § 445.572a(3)-(5).
Plaintiff is a “non-profit association of the manufacturers, marketers, distributors, and bottlers of virtually every nonalcoholic beverage sold in the United States,” including bottled water, juices, juice drinks, soft drinks, teas, dairy beverages, sports drinks, and energy drinks. (PL’s Br. 12.) Plaintiff seeks to protect “its members’ legal rights and the interests of the industry and beverage consumers” and represents members that produce beverages regulated by the Michigan 2008 Amendment to the Bottle Bill. (Id.)
On February 25, 2011, Plaintiff filed this action in the United States District Court for the Western District of Michigan against Defendants, seeking declaratory, injunctive, and other relief. Plaintiff claimed that Mich. Comp. Laws § 445.572a(10), a provision of the 2008 Bottle Bill, violated the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3. Plaintiff alleged that the 2008 provision requires interstate beverage manufacturers, on pain of criminal penalty, to produce, distribute, and sell designated beverages in unique-to-Michigan containers, and prohibits the sale of those same packaged beverages in all (or almost all) other States in the Country. Plaintiff further claimed that compliance with Michigan’s unique-mark requirement is extraterritorial because the Association’s members must “change the way they source and deliver product both in Michigan and in the other states in which they operate ... [by isolating] the Michigan-specific product in separate Michigan-specific manufacturing and distribution locations or in segregated areas of multi-state manufacturing and distribution facilities.” (R.l, Compl. ¶ 60.) According to Plaintiff, compliance with the statute increases the need for more warehouse space to separate inventory and eliminates flexibility in the supply chain.
Plaintiff moved for summary judgment arguing that, as a matter of law, the challenged statute is both extraterritorial and discriminatory in violation of the dormant Commerce Clause. Alternatively, Plaintiff argued that it should prevail under the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which upholds a state regulation unless the burden on interstate commerce outweighs the local benefits. Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citing Pike, 397 U.S. at 142, 90 S.Ct. 844). Defendants filed their response in opposition to summary judgment and, alternatively moved for summary judgment in their favor. On April 26, 2011, the district court issued an order, which permitted the MBWWA to intervene in support of Defendants.
The district court granted summary judgment to Defendants, finding that Mich. Comp. Laws § 445.572a(10) is neither discriminatory nor extraterritorial. As to the application of the Pike balancing test, the district court concluded that summary judgment was not appropriate be *803 cause a question of material fact existed on the extent of the burden that Mich. Comp. Laws § 445.572a(10) places on interstate commerce. Plaintiff filed a motion for reconsideration or for certification of interlocutory appeal. The district court denied Plaintiffs motion for reconsideration but granted certification for interlocutory appeal on the issue of whether Mich. Comp. Laws § 445.572a(10) is extraterritorial or discriminatory in violation of the dormant Commerce Clause under 28 U.S.C. § 1292(b). This Court issued an order concluding that an interlocutory appeal was appropriate in this matter.
DISCUSSION
I. Standard of Review
We review de novo the district court’s grant of summary judgment. Odle v. Decatur Cnty., Tenn., 421 F.3d 386, 389 (6th Cir.2005). Summary judgment is appropriate when “the movant shows that there is no genuine dispute as to any mate rial fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). We “must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party.” Cummings v. City of Akron, 418 F.3d 676, 682 (6th Cir.2005) (internal quotations and citation omitted). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth “specific facts showing that there is a genuine issue for trial.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and alternation omitted).
II. Dormant Commerce Clause
Under the Commerce Clause, Congress has the power “[t]o regulate Commerce with foreign Nations, and among the several States.... ” U.S. Const., art. I, § 8, cl. 3. “We have interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State.” C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). However, “[t]he [Commerce] Clause has long been understood to have a ‘negative’ aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.” Or. Waste Sys., Inc. v. Dep’t’ of Envtl. Quality of State of Or., 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). “The Clause, by negative implication, restricts the States’ ability to regulate interstate commerce.” Huish Detergents, Inc. v. Warren Cnty., Ky., 214 F.3d 707, 712 (6th Cir.2000). “The dormant Commerce Clause is driven by concern about ‘economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” Dept. of Revenue of Ky. v. Davis, 553 U.S. 328, 337-38, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).
This Circuit has adopted a two-step analysis to evaluate challenges to the dormant Commerce Clause. Int’l Dairy Foods Ass’n v. Boggs, 622 F.3d 628, 644 (6th Cir.2010). Under the first step, we must determine whether “a state statute directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests.” Id. (quoting Brown-Forman, 476 U.S. at 579, 106 S.Ct. 2080). “A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect.” Id. at 648 *804 (quoting E. Ky. Res. v. Fiscal Court of Magoffin Cnty. Ky., 127 F.3d 532, 540 (6th Cir.1997)). “[T]he critical consideration is the overall effect of the statute on both local and interstate activity.” Brown-Forman, 476 U.S. at 579, 106 S.Ct. 2080. The plaintiff bears the initial burden of proof to show that the state regulation is discriminatory. Davis, 553 U.S. at 338, 128 S.Ct. 1801.
If the plaintiff satisfies its burden, then “a discriminatory law is virtually per se invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.” Id. at 328, 128 S.Ct. 1801 (quoting Or. Waste Sys., Inc., 511 U.S. at 101, 114 S.Ct. 1345 (internal citation omitted)). However, if the state regulation is neither discriminatory nor extraterritorial, then the court must apply the balancing test established in Pike. Under the Pike balancing test, a state regulation is upheld “unless the burden it imposes upon interstate commerce is ‘clearly excessive in relation to the putative local benefits.’ ” Int’l Dairy, 622 F.3d at 644 (quoting Pike, 397 U.S. at 142, 90 S.Ct. 844).
A. Mich. Comp. Laws § 445.572a(10), Michigan’s unique-mark provision, does not discriminate against interstate commerce
Plaintiff argues that the Michigan unique-mark mandate, which requires certain beverage containers to possess a particular “symbol, mark, or other distinguishing characteristic,” Mich. Comp. Laws § 445.572a(10), discriminates against interstate commerce, facially, purposefully, and in effect, because the provision penalizes manufacturers if they choose to sell the beverage containers both in Michigan and in another state.
1. Facial Discrimination
Plaintiff claims that the unique-packing requirement facially violates the dormant Commerce Clause because the provision only applies to interstate manufacturers or shippers of beverages. According to Plaintiff, “Michigan enacted operative thresholds that are sufficiently high [and] are only met by companies who have a very high volume of business — that is, national brands.” (Pl.’s. Br. at 40.) The district court found that Michigan’s unique-mark provision is not facially discriminatory because “by its plain terms, the unique-mark requirement applies to all beverage manufacturers who meet the specified threshold regardless of their instate or out-of-state origins.”
“To determine whether a law violates [the] ‘dormant’ aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce.” United Haulers Ass’n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (citations omitted). “[Discrimination against interstate commerce in favor of local business or investment is per se invalid....” Carbone, 511 U.S. at 392, 114 S.Ct. 1677 (citation omitted). Thus, a state law is per se invalid if it provides “differential treatment of instate and out-of-state economic interests that benefits the former and burdens the latter.” United Haulers, 550 U.S. at 338, 127 S.Ct. 1786 (internal quotation marks and citation omitted).
Michigan’s unique-mark provision is not facially discriminatory against interstate commerce. The provision does not distinguish between in-state and out-of-state beverage manufacturers and requires all beverage containers to follow the unique-mark requirement. The provision states in relevant part:
*805 A symbol, mark, or other distinguishing characteristic that is placed on a designated metal container, designated glass container, or designated plastic container by a manufacturer to allow a reverse vending machine to determine if that container is a returnable container must be unique to this state, or used only in this state and 1 or more other states that have laws substantially similar to this act.
Mich. Comp. Laws § 445.572a(10). On its face, the provision is neutral in application. There is not an “obvious effort to saddle those outside the State” with the burden of complying with the regulation. Chem. Waste Mgmt. Inc. v. Hunt, 504 U.S. 334, 346, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992). Rather, the same unique marking requirement applies equally to in-state and out-of-state manufacturers. Therefore, whether a beverage manufacturer is located in Michigan or outside of the state, it must still comply with the statute’s requirements.[5] See United Haulers, 550 U.S. at 345, 127 S.Ct. 1786 (upholding a flow control ordinance which treated “instate private business interests exactly the same as out-of-state ones, [and therefore did] not discriminate against interstate commerce for purposes of the dormant Commerce Clause”) (internal quotation marks omitted).
2. Purposeful Discrimination
Plaintiff also alleges that Michigan’s unique-mark provision has a discriminatory purpose on the basis that the provision prohibits the sale of the same beverage containers manufactured in Michigan and other states, and prevents vendors in Michigan from purchasing the same beverage containers manufactured by out-of-state distributors.
To determine whether a state regulation purposefully discriminates within interstate commerce, we turn to the actual language in the statute. This is because the most “persuasive evidence of the purpose of a statute [are] the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning.” E. Ky. Res., 127 F.3d at 542 (quoting Perry v. Commerce Loan Co., 383 U.S. 392, 400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966)). Our review not only includes the statute itself, but also the legislative history and legislative intent to determine whether the statute achieved its legislative purpose.
Our analysis is somewhat limited given the scant legislative history of the State’s provision. The Michigan Legislature stated that the intended purpose of the statute was to prevent the illegal, fraudulent redemption of beverage containers in the State. See, e.g., House Fiscal Agency, Legislative Analysis of the Bottle Bill Revisions and RVM Antifraud Act, http:// www.legislature.mi.gov/documents/20072008/billanalysis/House/pdf/2007-HLA-5147-3.pdf, 2-6 (last visited August 20, 2012). The Michigan Soft Drink Association (“MSDA”) provided further support for the concern that fraudulent redemption was widespread. The MSDA stated that *806 “[i]n recent years, the fraudulent redemption of out-of-state beverage containers in Michigan has increased. Unclaimed deposits paid to the state declined from the peak of $23.5 million in 2000, to $8.9 million in 2007 — a drop of more than $10 million.” See MSDA Fraudulent Redemption, http://misoftdrink.org/Fraudulent_ Redemption.asp (last visited August 20, 2012). Plaintiff asserts that Michigan’s goal is to “maximize the flow of revenue” into the State by discriminating against interstate actors. But as the district court recognized, “there is nothing that indicates that Michigan is attempting to benefit local economic actors at the expense of out-of-state actors.” The text of the statute confirms that the Michigan Legislature intended to address a significant problem— the fraudulent redemption of beverage containers purchased outside the State— by regulating the conduct of both instate and out-of-state actors. See Mich. Comp. Laws § 445.572a(10). Absent concrete evidence from the statutory language that the unique-mark requirement is purposefully discriminatory, Plaintiff cannot prevail on this claim.
3. Discriminatory Effect
A statute may be discriminatory in effect if “the claimant [can] show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation.” Int'l Dairy, 622 F.3d at 648 (quoting E. Ky. Res., 127 F.3d at 543).
Plaintiff identifies three reasons why Michigan’s unique-mark provision is discriminatory in effect: “(1) the law requires the creation and maintenance of special state-exclusive production and distribution operations in order to do business in Michigan; (2) it eliminates the competitive advantages otherwise enjoyed by interstate companies; and (3) it impedes the free movement of commerce by imposing an economic and practical toll on interstate companies only.” (Pl.’s Br. 42-43); see also Granholm v. Heald, 544 U.S. 460, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005); Hunt v. Washington State Apple Adver. Comm’n, 432 U.S. 333, 351, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
Plaintiff relies on the Supreme Court case of Granholm v. Heald to show that the provision has a discriminatory purpose. In Heald, Michigan residents and an out-of-state winery alleged that Michigan laws that governed the distribution of alcohol violated the Commerce Clause because the laws allowed in-state wineries to ship directly to consumers in Michigan, subject only to a licensing requirement, while out-of-state wineries, whether licensed or not, were prohibited from direct shipment. Heald, 544 U.S. at 469, 125 S.Ct. 1885. The Supreme Court held that the Michigan regulatory scheme discriminated against interstate commerce because out-of-state wineries faced “two extra layers of overhead [which] increase[d] the cost of out-of-state wines to Michigan consumers.” Id. at 474, 125 S.Ct. 1885. The Court explained that “[t]he differential treatment require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers.” Id. Plaintiff in this case alleges in a similar fashion that the “Michigan-exclusive packaging mandate similarly requires interstate beverage companies to establish a Michigan-only production, warehousing, transportation, and distribution operation” in order to sell to Michigan consumers.
Heald is distinguishable, however, on the basis that the Michigan laws in Heald purposefully imposed a burden on out-of-state wineries by implementing a complete ban on direct shipment while allowing instate wineries to enjoy the benefits of di *807 rect shipment. This type of regulatory scheme clearly attempted to affect the market playing field by allowing Michigan wineries to gain market share against their out-of-state competitors.
In this case, the Michigan provision does not favor in-state beverage manufacturers and distributors over out-of-state. The unique-mark provision requires all those who sell certain amounts of beverages in Michigan to use the same unique-to-Michigan mark, without any reference to instate or out-state origins. Contrary to Plaintiffs assertion, the Michigan provision does not create an “extra layer of overhead” because all manufacturers and distributors are subject to the same provision. In essence, any manufacturer who wants to sell and distribute beverage containers regardless of whether they are instate or out-of-state, is subject to the unique-mark provision. Thus, we agree with the district court’s assessment that “the unique-mark requirement burdens instate beverage manufacturers who meet the designated thresholds to the same extent it burdens out-of-state manufacturers who meet the designated thresholds.” We therefore conclude that the State’s statute does not discriminate against interstate commerce on this basis.
B. Mich. Comp. Laws § 445.572a(10) is extraterritorial in violation of the dormant Commerce Clause
Despite our conclusion that Michigan’s unique-mark provision does not discriminate against interstate commerce, the Supreme Court recognizes “a second category of regulation that is also virtually per se invalid under the dormant Commerce Clause” — whether the law regulates extraterritorial commerce. Int’l Dairy, 622 F.3d at 645. A statute is extraterritorial if it “directly controls commerce occurring wholly outside the boundaries of a State [and] exceeds the inherent limits of the enacting State’s authority.” Healy v. Beer Inst. Inc., 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). The relevant inquiry is whether the “practical effect of the regulation is to control conduct beyond the boundaries of the State.” Id. at 336, 109 S.Ct. 2491 (citing Brown-Forman, 476 U.S. at 579, 106 S.Ct. 2080). To determine a statute’s “practical effect,” the court not only considers the consequences of the statute itself, but also “how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.” Id.
The Supreme Court has applied the extraterritoriality doctrine only in the limited context of price-affirmation statutes. These statutes force regulated entities to certify that the in-state price they charge for a good is no higher than the price they charge out-of-state. See Healy, 491 U.S. at 337-40, 109 S.Ct. 2491; Brown-Forman, 476 U.S. at 582-84, 106 S.Ct. 2080. In Brown-Forman, New York instituted a law that required distillers who posted wholesale prices in the state to not charge a lower price for the product in any other state during the month of posting. The New York law prevented the distillers from offering promotional allowances to wholesalers in other states, because the allowances lowered the effective price below the New York posted price. Brown-Forman, 476 U.S. at 577-78, 106 S.Ct. 2080. The Supreme Court found that by “[fjorcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.” Id. at 582, 106 S.Ct. 2080. Although New York is within its power to regulate the sale of liquor within its state, the Court held that “it may not project its legislation into [other States] by regulating the price to be paid *808 for liquor in those States.” Id. at 582-83, 106 S.Ct. 2080 (internal quotation marks and citation omitted).
Similarly in Healy, the Supreme Court struck down Connecticut’s price affirmation statute, which required out-of-state beer distributors to post their prices on each brand of beer sold in the State and to also affirm that their posted prices were no higher than prices in the border states of Massachusetts, Rhode Island, and New York. Healy, 491 U.S. at 326-29, 109 S.Ct. 2491. The Court found that Connecticut’s statute created “the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.” Id. at 337, 109 S.Ct. 2491. In addition, the Court concluded that the “effect of the Connecticut statute is essentially indistinguishable from the extraterritorial effect found unconstitutional in Brown-Forman ” by requiring “out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions.” Id. at 339, 109 S.Ct. 2491. Therefore, the Court concluded that any statute that has “the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State” is extraterritorial and violates the dormant Commerce Clause. Id. at 337, 109 S.Ct. 2491.
The district court noted that the Sixth Circuit has applied the extraterritorial doctrine to product labeling restrictions. Specifically, we held in International Dairy that Ohio’s labeling rule, which restricted the “types of claims that dairy processors could make about milk and milk products” did not violate the dormant Commerce Clause. Int’l Dairy, 622 F.3d at 633-34. The plaintiffs argued that Ohio’s labeling rule “force[d] them to create a nationwide label in accordance with Ohio’s requirements” in order to satisfy the complex national distribution channels for milk products. Id. at 647. The Sixth Circuit disagreed and stated that:
[UJnlike the price-affirmation statutes, which directly tied their pricing requirements to the prices charged by the distillers in other states, the Ohio Rule’s labeling requirements have no direct effect on the Processors’ out-of-state labeling conduct. That is to say, how the Processors label their products in Ohio has no bearing on how they are required to label their products in other states (or vice versa). Nor does compliance with the Ohio Rule raise the possibility that the Processors would be in violation of the regulations of another state — the key problem with the New York statute in Brown-Forman. The Rule accordingly does not purport to regulate conduct occurring wholly outside the state.
Id. (quotation marks and citation omitted). Thus, the Sixth Circuit concluded that Ohio’s product labels could be used anywhere in the country and did not create an extraterritorial problem.
But Plaintiff asserts that this case does not fit squarely either within the price-affirmation extraterritorial cases addressed by the Supreme Court or the product labeling ease from this Circuit. Rather, Plaintiff claims that Michigan’s unique-mark requirement is “quite different” because the label or container used in Michigan can be used only in Michigan. It cannot be used anywhere else. According to Plaintiff, Michigan “has made itself an economic island withdrawn from the national commerce stream in beverages.” Plaintiff cautions that if Michigan can “both prescribe what [beverage] products can be sold in-state and outlaw the sale of that same [beverage] product in other States of the Union ... [then] it can do it *809 for every other product [and] [s]o can every other State.” Plaintiff asserts that the State even criminalizes sales occurring in other states in violation of its statute by imposing a penalty of either a $2,000 fine and/or up to six months imprisonment.
Defendants dismiss Plaintiffs argument by stating that Michigan’s unique-mark requirement does not govern extraterritorially because no conflict exists between the states since Michigan is the only state with a unique-mark requirement, and the statute’s requirements does not directly control conduct occurring wholly outside the State’s border. We find Defendants’ logic flawed for several reasons.
First, Defendants fail to explore other alternative measures that could combat the State’s redemption problem. Defendants argue that the State’s provision is the only means to prevent fraudulent redemption and allow the State to retrieve unclaimed deposits to increase the state’s revenue. But it is difficult to reconcile how this provision is the only means for the State to address its redemption problem, when no other efforts were made by Defendants that could potentially satisfy the state’s purported legitimate purpose in a non-extraterritorial fashion. For example, it was suggested during oral argument that the State of Michigan could use the money from the unclaimed deposits and impose less burdensome measures, which may include limiting the number of beverage containers that may be redeemed by an individual or company. The State could also require consumers who wish to recycle beverage containers in Michigan to provide a proof of purchase receipt, which would indicate that the container was sold and purchased in the state. Plaintiff also recommends additional viable alternatives and suggests that a good starting point for Defendants would be the “vigorous enforcement of the only recently enacted law against retailer fraud.”
Furthermore, the nine other states that have instituted bottle deposit laws seemed to have adopted regulations without imposing any criminal or civil penalties on in-state or out-of-state manufacturers and distributors.[6] Although these alternative approaches may or may not be less desirable or may potentially raise other concerns, Defendants failed to consider reasonable alternatives before first committing themselves to a problematical course by implementing an invalid provision on extraterritorial grounds.
As we previously indicated, our analysis of the extraterritorial effect of the State’s unique-mark provision requires a consideration of “how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.” Healy, 491 U.S. at 336, 109 S.Ct. 2491. Plaintiff argues that additional extraterritorial problems triggered by the unique-mark requirement include the State projecting its regulatory regime into the jurisdiction *810 of another state and the potential destruction of the national common market through the adoption of state-exclusive product laws.
As an initial matter, we recognize that this case presents a novel issue of an “unusual extraterritoriality question” that has not been addressed either by the Supreme Court or any other court. To date, no other state has implemented a requirement similar to Michigan’s. However, Defendants’ reference to Plaintiffs argument as a “hypothetical inquiry” also deflects attention away from the real issue in that Michigan’s unique-mark requirement not only requires beverage companies to package a product unique to Michigan but also allows Michigan to dictate where the product can be sold. The reach of this statute and the criminal penalty for violations cannot be as easily dismissed as suggested by Defendants. Plaintiff must comply with the statute now or face criminal sanctions. In addition, other states must react today to Michigan’s unique-mark requirement or also face legal consequences. Thus, Michigan is forcing states to comply with its legislation in order to conduct business within its state, which creates an impermissible extraterritorial effect and is in violation of the Supreme Court’s precedent stated in Brown-Forman and Healy. See Brown-Forman, 476 U.S. at 583-84, 106 S.Ct. 2080; Healy, 491 U.S. at 334, 109 S.Ct. 2491; see also Heald, 544 U.S. at 473, 125 S.Ct. 1885 (finding that Michigan and New York’s regulatory schemes contribute to “[t]he current patchwork of laws — with some States banning direct shipments altogether, others doing so only for out-of-state wines, and still others requiring reciprocity ... invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.”) (quoting Dean Milk Co. v. Madison, 340 U.S. 349, 356, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (internal quotation marks omitted)). Therefore, we conclude that the Michigan statute is extraterritorial in violation of the dormant Commerce Clause because it impermissibly regulates interstate commerce by controlling conduct beyond the State of Michigan.[7]
CONCLUSION
In sum, we conclude that Mich. Comp. Laws § 445.572a(10), the State’s unique mark requirement, is not discriminatory. However, because the unique-mark requirement forces manufacturers and distributors of beverage containers to adopt the State’s unique labeling system, without the consideration of other less burdensome alternatives, Michigan’s unique-mark requirement has an impermissible extraterritorial effect. For these reasons, we REVERSE and REMAND to the district court with instructions to proceed consistently with this opinion. We also AFFIRM the district court’s order granting summary judgment to Defendant on the basis that the State statute is not discriminatory.

. The other states are: Massachusetts, New York, Maine, Vermont, Iowa, Hawaii, California, Oregon, and Connecticut.

. A "reverse vending machine” is defined as a “device designed to properly identify and process empty beverage containers and provide a means for a deposit refund on returnable containers.” Mich. Comp. Laws § 445.572a(12)(j).

. This currently includes seven Coca-Cola Enterprise products (Coca-Cola, Diet Coke, *802 Caffeine Free Diet Coke, Sprite, Coca-Cola Zero, Cherry Coke, and Dr. Pepper), five Pepsi Bottling Group products (Pepsi, Diet Pepsi, Mountain Dew, Diet Mountain Dew, and Diet Caffeine Free Pepsi), and three Dr. Pepper/Snapple products (A & W, Dr. Pepper, and Vernors). (Def.’s Br. 13.)

. The beverages include two Coca-Cola Refreshment products (Coca-Cola, Diet Coke) and four Pepsi Beverage Company products (Pepsi, Diet Pepsi, Mountain Dew, Diet Mountain Dew). (Def.'s Br. 14.).

. Plaintiff claims that Michigan’s unique-mark provision only applies to companies that engage in commerce in Michigan plus one other State as opposed to companies that operate solely within Michigan. But that is a misstatement. Any Michigan-based company that meets the State’s threshold sales requirement and chooses to engage in business within Michigan is subject to the same unique-mark provision as companies that compete in the national market and conduct business in Michigan. See Mich. Comp. Laws § 445.572a(1), (3), (5).

. See Cal. Pub. Res.Code § 14500 (2012) et seq.; Conn. Gen.Stat. § 22a-243 (2012) et seq.; Haw.Rev.Stat. § 342G-101 (2012) et. seq.; Iowa Code § 455C.1 (2012) et seq.; ME. Rev.Stat. 32 § 1861 (2011) et seq.; MA. Gen. Laws 94 § 321 (2012) et seq., N.Y. Envtl. Conserv. Law § 27-1001 (2012) et seq.; OR. Rev.Stat. § 459A.700 (2012) et seq.; VT. Stat. Ann. 10 § 1521 (2012) et seq. To be clear, Michigan's ten-cent deposit per beverage container contributes to the State's high redemption rate inasmuch as Michigan provides a higher refund value than all of the other participating states, with the exception of California, which administers ten-cent refunds for bottles 24 ounces or greater. Even so, no other state with a beverage container deposit law attempts to burden the beverage industry by forcing them to apply a unique-mark to their beverage containers in order to enter the Michigan market.

. Because we concluded that Michigan’s unique-mark provision does not discriminate against interstate commerce but is extraterritorial, the Pike balancing test does not apply. See Int’l Dairy, 622 F.3d at 646 (stating that the Pike balancing test controls when a state regulation is neither extraterritorial nor discriminatory in effect).