NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0127n.06

No. 23-5359

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 15, 2024
KELLY L. STEPHENS, Clerk

CAPWEALTH ADVISORS, LLC, )
)
    Plaintiff-Appellant, )
) ON APPEAL FROM THE
    v. ) UNITED STATES DISTRICT
) COURT FOR THE MIDDLE
TWIN CITY FIRE INSURANCE COMPANY, ) DISTRICT OF TENNESSEE
)
    Defendant-Appellee. ) OPINION
)

---

Before: GRIFFIN, BUSH, and LARSEN, Circuit Judges.

    GRIFFIN, Circuit Judge.

    This is an insurance-coverage dispute. Defendant Twin City Fire Insurance Company issued plaintiff CapWealth Advisors, LLC, a liability policy containing a specific-entity exclusion, which barred coverage for claims "in any way related to" CapWealth's previously affiliated brokerage firm. During the policy period, the U.S. Securities and Exchange Commission (SEC) investigated CapWealth and two of its employees for alleged securities-law violations stemming from their prior affiliation with that brokerage firm. Twin City denied coverage under the exclusion, and CapWealth sued Twin City for breach of contract. The district court granted summary judgment in Twin City's favor. We affirm.

I.

    CapWealth is a Tennessee-based firm that provides investment advice to its clients. Its affiliated brokerage firm, CapWealth Investment Services ("CWIS"), was founded simultaneously

with CapWealth in 2009 and placed orders for CapWealth's clients when they bought or sold securities.

When CWIS placed orders for certain shares of mutual funds, those transactions generated extra fees under SEC Rule 12b-1 issued under the Investment Company Act of 1940. *See* 17 C.F.R. § 270.12b-1 (2013). These so-called "12b-1 fees" were paid by clients, designated as revenue to CWIS, and passed in part to CapWealth. As registered representatives of CWIS, Timothy Pagliara (CapWealth's founder and chair) and Timothy Murphy (a CapWealth investment advisor) received some of these 12b-1 fees.

In 2014, CapWealth decided to narrow its focus to investment advice instead of also operating an affiliated brokerage firm, so it gradually wound down CWIS's operations over the next few years. After CWIS closed in June 2018, CapWealth no longer operated an affiliated broker, and neither CapWealth nor its professionals received any 12b-1 fees.

Over a year after CWIS closed, defendant Twin City issued an investment-advisor-liability policy to CapWealth, effective August 2019 to September 2020. This policy covered losses from "Claim[s]" for alleged "Wrongful Act[s]" in the performance of "Investment Adviser Professional Services" by CapWealth and its employees. As a "claims-made" policy, the policy covered claims first asserted against CapWealth during the policy period, regardless of when the alleged wrongful acts giving rise to the claims occurred.

The policy also contained several exclusions, i.e., provisions that "subtract coverage from an otherwise broad grant." *Atl. Specialty Ins. Co. v. Stanley*, 2019 WL 4440402, at *3 (6th Cir. Aug. 23, 2019) (order) (brackets omitted). Relevant here, the policy's specific-entity exclusion provided:

> The Insurer shall not pay Loss for any Claim . . . . by or against, or based upon, arising from, or in any way related to any of the following entity(ies), including,

but not limited to any, subsidiary, trustee, receiver, assignee, director, officer, employee, shareholder, or beneficiary thereof:

CapWealth Investment Services, LLC

In early 2020, the SEC began to investigate CapWealth, Pagliara, and Murphy, focusing on potential conflicts of interest stemming from CWIS's generation of 12b-1 fees on mutual-fund shares recommended by CapWealth. The SEC first issued Wells Notices[1] to CapWealth, Pagliara, and Murphy, stating that it had decided to recommend enforcement action for securities-law violations. It then filed a complaint alleging that, from June 2015 to June 2018, CapWealth, Pagliara, and Murphy purchased, recommended, or held for clients mutual-fund share classes that charged 12b-1 fees even though lower-cost share classes of the same funds were available. The complaint asserted that this arrangement resulted in an illegal conflict of interest because CapWealth, Pagliara, and Murphy received, through CWIS, proceeds from these 12b-1 fees but did not disclose this information to clients. The SEC also charged CapWealth with failing to achieve "best execution"—not investing clients' money in the most efficient, lowest-cost manner—because CapWealth had exposed clients to avoidable 12b-1 fees. And it levied a books-and-records charge, asserting CapWealth failed to implement written policies to prevent securities-law violations.

CapWealth notified Twin City of the SEC investigation and requested coverage for resulting losses in May 2020. But Twin City denied coverage, citing the specific-entity exclusion, because the claim was "in any way related to" CWIS. So CapWealth sued Twin City in Tennessee

---

[1]Wells Notices are communications from the SEC to individuals or firms subject to SEC investigation informing them that the SEC plans to pursue enforcement action against them for securities-law violations. SEC Div. of Enf't, *Enforcement Manual* 19–20 (2017).

state court, asserting that Twin City breached its insurance policy by denying coverage. Twin City removed the case to federal court.

Twin City then moved for summary judgment, arguing that the SEC investigation and enforcement action fell within the specific-entity exclusion.[2] The district court agreed, granted Twin City's motion for summary judgment, and entered judgment in its favor. This appeal followed.

## II.

We review a grant of summary judgment de novo. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In federal diversity actions, such as this one, "state law governs substantive issues and federal law governs procedural issues." *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002). Here, the parties agree that Tennessee law applies. If Tennessee law is unclear, we consider all relevant data and make an "*Erie* guess," i.e., predict how the Tennessee Supreme Court would rule on the issue. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–80 (1938).

---

[2]While the summary-judgment motion was pending before the district court in this coverage action, the SEC's enforcement action against CapWealth went to trial. A jury rejected the SEC's claims, and judgment was entered against the SEC and in favor of CapWealth on all charges. *SEC v. CapWealth Advisors LLC*, No. 3:20-cv-1064 (M.D. Tenn. Nov. 1, 2022), ECF No. 166. Neither CapWealth nor Twin City contends that the result in the underlying action affects this coverage dispute**.**

A.

CapWealth argues that summary judgment was inappropriate for two reasons: (1) the policy's language is ambiguous and should be construed in CapWealth's favor; and (2) if not, the specific-entity exclusion's unambiguous meaning renders coverage illusory such that the exclusion is unenforceable. We address and reject each argument in turn.

1.

CapWealth first argues that the policy is ambiguous and therefore must be construed in its favor. When interpreting insurance policies, the Tennessee Supreme Court uses "the same tenets that guide the construction of any other contract." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012). The primary goal "is to ascertain and give effect to the intent of the parties." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012). To ascertain that intent, Tennessee courts first look only to the four corners of the insurance policy, giving policy terms their "plain, ordinary and popular" meaning. *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170, 173 (Tenn. 2019). Tennessee courts interpret policies "as a whole" and examine the disputed language "in the context of the entire agreement." *Garrison*, 377 S.W.3d at 664 (citation omitted). If a policy's terms are unambiguous, the inquiry ends, and the policy "will be enforced as written." *Certain Underwriter's at Lloyd's of London v. Transcarriers Inc.*, 107 S.W.3d 496, 499 (Tenn. Ct. App. 2002).

"Where language in an insurance policy is susceptible of more than one reasonable interpretation, however, it is ambiguous." *Am. Just. Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 815 (Tenn. 2000). Because the insurance company drafted the policy, ambiguous language "must be construed against the insurance company and in favor of the insured." *Id.* But courts must not use "strained construction . . . to find ambiguity where none exists." *Lammert*, 572 S.W.3d at 173.

A policy term "is not ambiguous simply because 'creative possibilities' as to its meaning can be suggested by the parties" or because it may have "a broad meaning." *Stonebridge Life Ins. Co. v. Horne*, 2012 WL 5870386, at \*4–5 (Tenn. Ct. App. Nov. 21, 2012) (quoting 16 *Williston on Contracts* § 49:17 (4th ed.)). Ambiguity results only when policy language "is of uncertain meaning and may fairly be understood in more ways than one." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

Here, the specific-entity exclusion bars coverage for "any Claim . . . by or against, or based upon, arising from, or in any way related to" CWIS. Twin City contends, and the district court agreed, that the exclusion unambiguously applied to the SEC investigation and enforcement action because those proceedings were "in any way related to" CWIS.

To determine whether the policy term is ambiguous, we first need to define the "Claim" to which the exclusion would apply. CapWealth argues that the SEC's complaint involved three separate claims: (1) the claim for failure to disclose conflicts of interest; (2) the claim for failure to obtain best execution; and (3) the books-and-records claim. But this argument ignores the policy's definition of the term "Claim," which means either (1) any "civil proceeding against any Insured . . . commenced by the filing of a . . . complaint"; or (2) any "administrative or regulatory proceeding against, or investigation of any Insured commenced by . . . the filing of a . . . Wells Notice naming such Insured." Consequently, a "Claim" is an entire civil proceeding or regulatory investigation, not an individual cause of action. Under the policy's terms, then, there could be two "Claims" here—one for the SEC investigation (commenced by the filing of the Wells Notice) and another for the SEC civil action (commenced by the filing of the complaint). But the civil action followed naturally from the results of the investigation, and the factual bases underlying the two

proceedings were the same. Thus, we analyze the SEC's joint investigation and enforcement action against CapWealth, Pagliara, and Murphy as the single "Claim" at issue.

Next, we ask whether the Claim was "in any way related to" CWIS. That language has expansive meaning. We have previously analyzed similar language in the insurance context and found it to be "staggeringly broad." *See, e.g.*, *Glob. Fitness Holdings, LLC v. Navigators Mgmt. Co., Inc.*, 854 F. App'x 719, 721–22 (6th Cir. 2021) (applying Kentucky law) (holding that coverage was barred under "staggeringly broad" language excluding coverage for any claim "relating to . . . or in any way involving any liability under any contract or agreement"); *US HF Cellular Commc'ns, LLC v. Scottsdale Ins. Co.*, 776 F. App'x 275, 288–89 (6th Cir. 2019) (applying California law) (holding that coverage was barred under "staggeringly broad" language excluding coverage for any claim that "in any way involv[ed]" inaccurate information in an insurance application). We have no doubt that the Tennessee Supreme Court would agree, for the "plain, ordinary and popular" meaning of that phrase connotes wide breadth. *Lammert*, 572 S.W.3d at 173; *see also, e.g.*, *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008) (holding that release for claims "in any way related to" securities litigation was broad but that expansiveness did not create ambiguity); *Weatherly v. Eastman Chem. Co.*, 2023 WL 5013823, at *5 (Tenn. Ct. App. Aug. 7, 2023) (characterizing the statutory definition of "asbestos action" as "broad" because it included all claims "arising out of, based on or *related to* the health effects of exposure to asbestos" (emphasis added) (citation omitted)).

That said, a reasonable interpretation of "in any way related to" must have some limitation. After all, we do not read exclusion terms in isolation to give them "virtually boundless" meaning. *See Barber v. Arch Ins. Co.*, 852 F. App'x 210, 215 (6th Cir. 2021) (citation omitted); *see also Doctrine of Illusory Coverage*, Black's Law Dictionary (11th ed. 2019) ("Courts avoid interpreting

insurance policies in such a way that an insured's coverage is never triggered and the insurer bears no risk."). At bottom, "in any way related to" means "related to," which requires an unattenuated, logical connection. *See, e.g.*, *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989) ("At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship . . . .").

The Claim was plainly "related to" CWIS. The heart of the Claim was the SEC's allegations that Pagliara and Murphy, as registered representatives of CWIS, collected the 12b-1 fees that caused the conflicts of interest. As the district court found, without the affiliation between CapWealth and CWIS, the SEC's investigation and enforcement action "likely would not have occurred" because there would have been no apparent conflict of interest. Given CWIS's centrality to the SEC's allegations, we conclude that the Claim "related to" CWIS and thus comfortably falls within the exclusion's scope.

CapWealth offers an alternative interpretation, but it is not a reasonable one. CapWealth asserts that the exclusion merely clarifies that the policy did not cover CWIS. But this interpretation grates against the basic principle of contract interpretation that "[a]ll words used in a contract are presumed to have meaning." *Graybar Elec. Co. v. Davco Corp.*, 1985 WL 3429, at *2 (Tenn. Ct. App. Nov. 1, 1985); *see also Wimpee v. Grange Mut. Cas. Co.*, 2003 WL 24213899, at *4 (Tenn. Ct. App. Dec. 31, 2003); *Associated Press v. WGNS, Inc.*, 348 S.W.2d 507, 512 (Tenn. Ct. App. 1961). CWIS was not an insured under the policy, so interpreting the exclusion as merely clarifying that CWIS was not covered would render the exclusion meaningless. Further, the exclusion separately bars coverage for claims "against" CWIS, so interpreting "in any way related to" to mean "against" would render the word "against" meaningless. An alternative, unreasonable

interpretation does not create ambiguity. *See Lammert*, 572 S.W.3d at 173; *Stonebridge Life Ins. Co.*, 2012 WL 5870386, at \*4. The exclusion is unambiguous, and the Claim falls within its scope.

2.

CapWealth next argues, in the alternative, that if the exclusion is unambiguous, then the policy's coverage is illusory and therefore unenforceable. *See, e.g.*, *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000). Illusoriness results when a contract "essentially promises nothing at all, or allow[s] the promisor to decide whether or not to perform the promised act." *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 752 (E.D. Tenn. 2011) (citation omitted); *see also Floss*, 211 F.3d at 315. In the context of insurance policies, Tennessee courts have referred to the concept of illusory coverage. But they have not clarified how they apply the so-called "illusory-coverage doctrine" or how to determine whether coverage is illusory.

For instance, in *Williams v. State Farm Mutual Automobile Insurance Co.*, 2020 WL 6821700, at \*7 (Tenn. Ct. App. Nov. 20, 2020), the court analyzed only ambiguity, not illusoriness, before concluding that the policy exemption at issue was "neither illusory nor ambiguous." Likewise, in *Tennessee Risk Management Trust v. Yancey*, 2010 WL 173302, at \*6 (Tenn. Ct. App. Jan. 19, 2010), although the court held that coverage was not illusory, it merely determined that the claim fell outside the scope of coverage—it did not discuss illusoriness as a separate issue. And in *National Union Fire Insurance Co. of Pittsburgh v. Federal Deposit Insurance Corp.*, 1995 WL 48462, at \*3–5 (Tenn. Ct. App. Feb. 8, 1995), the court, deciding the case on other grounds, did not reach the appellant's illusory-coverage argument.

Given this lack of guidance from Tennessee cases, the parties here dispute the appropriate test to apply. Twin City argues that, for coverage to be illusory, "an insured must show that the insurer essentially bears no risk under the policy." CapWealth, meanwhile, argues that the correct

test is whether a policy would pay benefits in any reasonably foreseeable set of circumstances. But we need not decide which test the Tennessee Supreme Court would apply—even assuming CapWealth's reasonable-foreseeability test applies, its illusory-coverage arguments fail.[3]

Under CapWealth's favored test, the Twin City policy is illusory if, applied to "any reasonably expected set of circumstances," it would yield no coverage. *Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694, 699 (S.D. Ind. 1996) (citation omitted). This test is one of "degree, not absolutes," such that "an insurer cannot avoid an illusory coverage problem by simply conceiving of a single hypothetical situation to which coverage would apply." *Id.* at 701. Coverage becomes illusory when the likelihood of its application is "sufficiently remote," even if theoretically possible. *Id.* at 702; *see also Am. Fam. Mut. Ins. Co. v. Jeffery*, 2000 WL 680410, at *11 (S.D. Ind. Feb. 28, 2000) (holding coverage illusory where "the covered risks amount to a tiny sliver of what anyone might reasonably expect" from the insurance policy at issue).

CapWealth asserts that the specific-entity exclusion renders coverage illusory because it eliminates nearly all coverage along two dimensions: (1) for any claim related to two of CapWealth's principals (Pagliara and Murphy), and (2) for any claim arising from activities before CWIS's closure in 2018.

As to CapWealth's first argument, recall that the exclusion bars coverage for claims "in any way related to" CWIS, including any "director, officer, employee, shareholder, or beneficiary

---

[3]Because CapWealth's arguments fail under its own proposed test, we reject as both unnecessary and untimely CapWealth's invitation to certify any illusory-coverage question to the Tennessee Supreme Court. *See Devereux v. Knox Cnty.*, 15 F.4th 388, 398 (6th Cir. 2021) (applying Tennessee law) (rejecting certification request); *In re Amazon.com, Inc., Fulfillment Ctr. Fair Lab. Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 607 (6th Cir. 2017) ("[T]he appropriate time to request certification of a state-law issue 'is before, not after, the district court has resolved [it].'" (second alteration in original) (citation omitted)).

thereof." Pagliara and Murphy are advisors at CapWealth and were officers of CWIS. Pagliara further serves as CapWealth's chair and chief investment officer. As CapWealth argues, virtually any claim against CapWealth in any reasonably foreseeable set of circumstances would be "related to" Pagliara or Murphy, who were officers of CWIS. Because such claims would be barred under a literal interpretation of the exclusion, CapWealth asserts, coverage is illusory.

But CapWealth is fighting a straw man—the purportedly "literal" interpretation it addresses is far broader than the exclusion's unambiguous meaning here. The unambiguous meaning of the specific-entity exclusion is that it applies when the claim is "related to" a *specific entity*—CWIS. For the exclusion to apply, therefore, a claim must relate to Pagliara and Murphy in their capacities as employees of the specific entity excluded. That a claim might be "in any way related to" Pagliara or Murphy, solely in their capacities as CapWealth employees, would not alone trigger the exclusion.

There are reasonably foreseeable circumstances in which claims would not be related to Pagliara or Murphy in their CWIS capacities. The most obvious set of circumstances is any claim based on alleged wrongful acts committed after CWIS shut down in June 2018. Any alleged wrongful act that occurred between June 2018 and September 2020 and that resulted in an investigation or lawsuit within the policy period (August 2019–September 2020) would not have related to Pagliara or Murphy in their CWIS capacities. Accordingly, for nearly a two-year period following June 2018, alleged wrongful acts by CapWealth, Pagliara, or Murphy would not have triggered the specific-entity exclusion and presumably would have yielded coverage.

That leaves CapWealth's second argument: the exclusion renders coverage illusory because it eliminates nearly all coverage for CapWealth's activities before CWIS's closure in 2018. As CapWealth asserts, the policy was supposed to cover potential alleged wrongful acts

from CapWealth's founding in 2009 through the end of the policy period in 2020, and the specific-entity exclusion effectively excludes any events before June 2018. But even assuming CapWealth is correct that any reasonably foreseeable claim before June 2018 would have somehow "related to" CWIS, coverage was not illusory because the policy still covered a period of almost two years after that date. CapWealth cites no authority suggesting that coverage is illusory based on a temporal limitation for claims arising from events in the past when a large period closer to the present is otherwise covered. While 2009–2018 certainly accounts for the majority of 2009–2020, our focus is on whether coverage would be available under "*any* reasonably expected set of circumstances." *Monticello Ins. Co.*, 949 F. Supp. at 699 (emphasis added). As explained above, one could reasonably expect potential claims to have arisen based on events between June 2018 and September 2020. In such circumstances, CWIS (then closed) would have been unrelated to those claims, and the specific-entity exclusions would not have applied. Thus, under CapWealth's own test, coverage is not illusory.

B.

CapWealth next asserts, for the first time on appeal, that the concurrent-cause doctrine requires that the exclusion be interpreted in favor of coverage. Under that doctrine, where a loss resulted from a combination of both excluded and non-excluded causes, an exclusion should not apply if a non-excluded cause was a "substantial factor" in causing the loss. *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 887 (Tenn. 1991).

But CapWealth forfeited this argument by not asserting it in the district court. Indeed, in its reply brief here, CapWealth admits that this argument was "unarticulated" below. Arguments not raised before the district court may not be raised for the first time on appeal. *McDaniel v.*

*Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 948 (6th Cir. 2018); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).

CapWealth's sole response to forfeiture is that its concurrent-cause argument is merely a "sub-argument" of the broader point it made to the district court about construing ambiguities in favor of the insured. But that assertion is incorrect—the concurrent-cause doctrine is distinct from the textual exercise of construing ambiguities in the insured's favor. CapWealth's concurrent-cause argument casts the words "in any way related to" in a casual light and asks whether, factually, another cause was a "substantial factor" in bringing about the loss. This is, in fact, a separate argument, and it is one that CapWealth forfeited.

CapWealth makes no argument that we should exercise our discretion to hear this forfeited argument, *see Scottsdale*, 513 F.3d at 552, and we thus decline to consider it.

III.

For the reasons stated, we affirm the judgment of the district court.